No. 2022-1411

# United States Court of Appeals
## for the Third Circuit

PACIRA BIOSCIENCES, Inc.,        )      Appeal from the United States
     Plaintiff-Appellant,       )      District Court for the
                           )      District of New Jersey
                           )      (No. 2:21-cv-09246)
           v.               )
                           )
AMERICAN SOCIETY OF         )
ANESTHESIOLOGISTS, Inc., et al.,   )      Hon. Madeline Cox Arleo
     Defendants-Appellees.      )      United States District Judge

---

Amicus Curiae Brief of American Medical Association and Medical Society of New Jersey in Support of American Society of Anesthesiologists, Inc., Defendant-Appellee and Supporting Affirmance

---

Leonard A. Nelson
American Medical Association
330 N. Wabash Avenue
Chicago, Illinois 60611
(312) 464-5532
Leonard.nelson@ama-assn.org
Attorney for *Amici Curiae*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

*Amici* are not-for-profit professional membership associations that do not have parent corporations or issue stock.

# TABLE OF CONTENTS

Corporate Disclosure Statement ................................................................. i

Table of Authorities ............................................................................... iii

Identification of *Amici Curiae* ............................................................... 1

Introduction .......................................................................................... 3

Summary of Argument ........................................................................... 4

Argument............................................................................................... 5

I.     The Protocols for Publication of Peer-Reviewed Articles in Academic
       Medical Journals, Such as *Anesthesiology*, Ensure Scientific Integrity........... 5

II.    The Legal System Is Ill Suited to Resolve Scientific Questions Like
       Those Addressed in the *Anesthesiology* Articles........................................... 11

III.   Relaxation of the Standards for Trade Libel Would Undermine Medical
       Research............................................................................................. 13

Conclusion ........................................................................................... 14

Combined Certifications ......................................................................... 16

# TABLE OF AUTHORITIES

**Cases**

*Daubert v. Merrell Dow Pharmaceutical, Inc.*,
　509 U.S. 579 (1993) .............................................................. 11, 12, 13

*Frye v. United States*,
　54 App.D.C. 46, 293 F. 1013 (1923)................................................. 12

*Nekrilov v. City of Jersey City*,
　45 F.4th 662 (3d Cir. 2022) ............................................................ 8

**Statutes**

21 U.S.C §355........................................................................... 8

NJSA §45:9-7.1......................................................................... 6

**Regulations**

42 CFR § 482.12(a)(1)................................................................. 6

42 CFR § 482.12(a)(2)................................................................. 6

**Other Authorities**

J. Bakan, et al, "Medical Journals and Free Speech," *Pediatrics*, 2015 Mar;
　135(3): 403-405 .................................................................... 14

K. Bessoff, "Chest Wall Analgesia – Where Do We Go from Here?" *JAMA Netw.
　Open*, 2021; 4(11): e2133839.................................................... 9

Clarivate, *Journal Citation Reports: Learn the Basics*,
　https://clarivate.libguides.com/jcr ...................................... 10

Code of Medical Ethics of the American Medical Association, Opinion 9.6.6,
　*Prescribing and Dispensing Drugs and Devices* ............................ 6, 8

A. Grayling, "End Libel Law's Chilling Effect on Science," *BMJ* 2010:340:c339 ............................................................................................ 13

C. Guerra-Londono, "Assessment of Intercostal Nerve Block Analgesia for Thoracic Surgery: A Systematic Review and Meta-Analysis," *JAMA Netw. Open,* 2021, 4(11): e2133394 ............................................................. 9

T. Hamilton, "Efficacy of Liposomal Bupivacaine and Bupivacaine Hydrochloride vs. Bupivacaine Hydrocholoride Alone as A Periarticular Anesthetic for Patients Undergoing Knee Replacement: A Randomized Clinical Trial," *JAMA Surg*. 2022, 157(6): 481-489 ............................................ 9

T. Hamilton, "Liposomal Bupivacaine – A Boon for Opioid-Sparing Surgery? – Reply," *JAMA Surg*. 2022, doi:10.1001 ............................................ 9

https://www.abms.org/board/american-board-of-anesthesiology/#aba-a ................ 6

https://www.abms.org/board-certification/board-certification-requirements/#ic ..... 6

https://en.wikipedia.org/wiki/BlackRock ................................................................. 3

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8411047/ ................................... 10

https://pubs.asahq.org/anesthesiology/pages/about-the-journal ............................ 10

https://www.science.org/content/article/secret-half-lives-scientific-papers#:~:text=The%20median%20half%2Dlife%20across,to%205%20yea rs%20after%20publication ............................................................................... 10

L. Luo, "Liposomal Bupivacaine – A Boon for Opioid-Sparing Surgery?" *JAMA Surg*. 2022, doi:10.1001 ............................................................... 9

H. Sandhu, "Effectiveness of Standard Local Anesthetic Bupivacaine and Liposomal Bupivacaine for Postoperative Pain Control in Patients Undergoing Truncal Incisions: A Randomized Clinical Trial," *JAMA Netw. Open*, 2021; 4(3): e210753 .................................................................. 9

The American Medical Association (AMA) is the largest professional association of physicians, residents, and medical students in the United States. Additionally, through state and specialty medical societies and other physician groups seated in its House of Delegates, substantially all physicians, residents and medical students in the United States are represented in the AMA's policy making process. AMA members practice and reside in all states, including New Jersey. The objectives of the AMA are to promote the science and art of medicine and the betterment of public health.

The AMA publishes peer-reviewed academic medical articles through its flagship publication, *JAMA* (a/k/a *The Journal of the American Medical Association*) and through related publications known as *JAMA Network*. *JAMA* has the largest print circulation of any medical journal in the world. Nearly one million physicians and other health care professionals receive electronic content from *JAMA Network* each week.

The Medical Society of New Jersey (MSNJ), a constituent association of the AMA, is a New Jersey not-for-profit corporation organized and existing under the

---

[1] *Amici* certify that no party's counsel authored this brief in whole or in part, no party or party's counsel contributed money intended to fund preparation or submission of this brief, and no person other than *amici* and their counsel contributed money intended to fund preparation or submission of the brief. All parties have consented to the filing of this brief.

laws of the State of New Jersey and headquartered in Lawrenceville, New Jersey. Representing more than 8,000 physicians practicing in New Jersey, MSNJ was founded in 1766 and is the oldest professional society in the United States. In representing all medical disciplines, MSNJ advocates for the rights of patients and physicians alike, seeking the *delivery* of the highest quality medical care. Its stated mission is "[t]o promote the betterment of the public health and the science and the art of medicine, to enlighten public opinion in regard to the problems of medicine, and to safeguard the rights of the practitioners of medicine."

The AMA and MSNJ submit this brief on their own behalves and as representatives of the Litigation Center of the American Medical Association and the State Medical Societies. The Litigation Center is a coalition among the AMA and the medical societies of each state, plus the District of Columbia, whose purpose is to represent the viewpoint of organized medicine in the courts.

*Amici* offer this brief to further their mission of providing the best possible medical care to the people of New Jersey and to all people in the United States. They believe that the proper forum to debate scientific findings is in the pages of peer-reviewed academic journals and not in the courts. Optimal medical care is possible only if researchers are free to publish the results of their research – and to critique the results of others' research – without fear of a crippling lawsuit from those who may be disadvantaged by the open dissemination of medical and other

scientific findings. In this brief, *amici* will explain why lawsuits such as this one unnecessarily burden public health and suppress the advancement of medical science.

## INTRODUCTION

The American Society of Anesthesiologists (ASA) published a series of technical articles in *Anesthesiology*, an academic, peer-reviewed medical journal, JA34, regarding the efficacy of liposomal bupivacaine, a non-opioid drug intended to ameliorate post-surgical pain. Liposomal bupivacaine is sold under the trade name Exparel. JA32. The *Anesthesiology* articles asserted that Exparel was generally no more effective than existing analgesics, although it was decidedly more expensive. JA39. ASA published similar conclusions on its website, in a podcast, and in continuing medical education materials. JA70.

Pacira BioSciences (Pacira) manufactures and sells liposomal bupivacaine/Exparel. JA32. The major stockholder, or perhaps the only stockholder, of Pacira is BlackRock, Inc. *See* Corporate Disclosure Statement of Pacira. BlackRock is the largest asset manager in the world, with a reported $10 trillion in assets under management as of January 2022. https://en.wikipedia.org/wiki/BlackRock.

Pacira sued ASA and the authors of the *Anesthesiology* articles for trade libel. JA31-32. It claimed that the ASA conclusions were defamatory, erroneous, and resulted from personal bias. JA 33,71-72.

On a Rule 12(b)(6) motion, the district court dismissed the complaint without leave to amend. It held that a successful trade libel suit against a scientific article must be based on intentionally falsified data, but this allegation was missing from the Pacira complaint. JA1-12. This appeal followed. JA14.

## SUMMARY OF ARGUMENT

The question addressed in the *Anesthesiology* articles, whether Exparel provides sufficient medical benefits to justify its cost, is one suited for determination by physicians, rather than by judges or juries. Regardless of whether the district court was correct in its determination that a trade libel suit based on a scientific publication requires a showing of intentionally falsified data, the articles in question were statements of opinion and would not be subject to a defamation action even if made outside the scientific context.

All medical studies have limitations, and no one study is definitive. Medical science evolves, and academic journals must publish articles that take fresh looks at emerging and approved drugs and treatment regimens. If the conclusions of the *Anesthesiology* articles were incorrect and the methodologies were flawed, the truth will be discovered through accepted scientific processes. The

anesthesiologists who prescribe the medication will not be long fooled, and if the articles were wrong then further research will demonstrate this. Moreover, *Anesthesiology* would suffer a loss of prestige and of readership. Although Pacira BioSciences could lose sales while the scientific method runs its course, any undeserved stain on Exparel will ultimately be cleared.

By contrast, the judicial process is unsuited to a controversy of this type. The rules of evidence and the nature of the jury system simply are not geared to a meaningful determination of the issue addressed in *Anesthesiology.* The likelihood of an incorrect judgment by a court is far greater than the likelihood of a mistake in the scientific process. Moreover, whether the final legal judgment might be right or wrong, merely conducting a complex, uncertain, and expensive lawsuit of this nature will chill further medical research, to the detriment of those patients who would most benefit from tomorrow's breakthroughs.

## **ARGUMENT**

I.     **The Protocols for Publication of Peer-Reviewed Articles in Academic Medical Journals, Such as *Anesthesiology*, Ensure Scientific Integrity.**

Medical research is targeted toward the advancement of medical science, with a focus on enhancing patient health. Publications are issued and evaluated in a fiercely competitive environment, which is designed to weed out error and challenge or validate claims.

The target audience for the *Anesthesiology* articles is practicing anesthesiologists. These physicians are highly trained through years of medical school, residency programs, and frequently through post-residency fellowships. They must be licensed by their state medical boards. https://www.abms.org/board-certification/board-certification-requirements/#ic. They are credentialed and then periodically recredentialed to work in hospitals. 42 CFR § 482.12(a)(1) & (2). In most states, including New Jersey, they are required to take continuing medical education classes, so they are apprised of the latest medical developments. NJSA §45:9-7.1. To be fully certified by the American Board of Anesthesiology, they must have practiced anesthesiology for seven years. https://www.abms.org/board/american-board-of-anesthesiology/#aba-a. And, of course, anesthesiologists treat patients on a daily basis.

Anesthesiologists read technical articles, such as those in *Anesthesiology*, so they can properly care for their patients. This is their focus. They prescribe drugs based on the needs of the individual patient. *See* Code of Medical Ethics of the American Medical Association, Opinion 9.6.6, *Prescribing and Dispensing Drugs and Devices.* They educate themselves about the drugs they are prescribing and how those drugs compare with alternative medications.

Because of the inherent uncertainty of medical knowledge and because of their scientific training, anesthesiologists must evaluate what they read with skepticism.

They are well aware that medical science is constantly changing and that what may be sound advice for one patient may be inadvisable for another.

Consider the *Anesthesiology* evaluations of Exparel. Nothing in the articles maintained that Exparel is wholly without value or that no patient can possibly benefit from it. Moreover, the articles clearly state that the studies on liposomal bupivacaine are mixed, although in the opinion of the authors the drug is generally not worth the cost. Thus, the caption under the picture in the *Anesthesiology* editorial, JA159, prominently states:

> "liposomal bupivacaine was found to be superior to comparators in 46% of conflicted (pharma-sponsored) trials but was found to be superior in only 11% of the non-conflicted trials."

Similarly, the second bullet in the "Editor's Perspective" on the first page of the Hussain article, JA77, states:

> "Despite the availability of many studies, it remains unclear whether and when liposomal bupivacaine offers significant advantages over the standard formulation"

Likewise, the Abstract on the first page of the Ilfeld article, JA96, states:

> "The preponderance of evidence fails to support the routine use of liposomal bupivacaine over standard local anesthetics."

In other words, while Exparel may have value, anesthesiologists should be cautious about prescribing it, particularly since it costs around one hundred times as much per dose as alternative medications. JA161.[2]

The anesthesiologists who read the *Anesthesiology* articles, some of whom have undoubtedly prescribed Exparel, know that the Food and Drug Administration has approved it for sale. *See, e.g.,* JA159. This means that the FDA, after due investigation, found Exparel to be safe and effective. 21 U.S.C §355. The very essence of the articles under attack is that the many evaluations of Exparel have reached different conclusions, but in the opinion of the articles' authors the better studies have found that Exparel is not superior to its alternatives -- although it costs one hundred times as much. JA161

Anesthesiologists know that Exparel is not opium based, but the other medications are. If they are to care for their patients properly, they will evaluate the articles' conclusions judiciously to decide on a case-by-case basis what is best for each different situation. *Code of Medical Ethics* Opinion 9.6.6, *Prescribing and Dispensing Drugs and Devices.*

---

[2] The Pacira complaint alleged that the conclusions of the *Anesthesiology* articles were made "with no accompanying or explanatory information," JA149, and that the articles reached "blanket, unqualified conclusions that EXPAREL is not effective – in any type of use or any type of surgery." JA150. These exaggerations are belied by the exhibits Pacira appended to its complaint, which now bind it. *Nekrilov v. City of Jersey City*, 45 F.4th 662 (3d Cir. 2022).

Furthermore, just as the *Anesthesiology* articles critique earlier studies, subsequent researchers have undertaken new investigations that may support or diminish these articles. Thus, since the *Anesthesiology* issue of February 2021 (the one in question), the AMA medical journals, alone, have published the following evaluations of liposomal bupivacaine: T. Hamilton, "Efficacy of Liposomal Bupivacaine and Bupivacaine Hydrochloride vs. Bupivacaine Hydrocholoride Alone as A Periarticular Anesthetic for Patients Undergoing Knee Replacement: A Randomized Clinical Trial," *JAMA Surg*. 2022, 157(6): 481-489; L. Luo, "Liposomal Bupivacaine – A Boon for Opioid-Sparing Surgery?" *JAMA Surg*. 2022, doi:10.1001; T. Hamilton, "Liposomal Bupivacaine – A Boon for Opioid-Sparing Surgery? – Reply," *JAMA Surg*. 2022, doi:10.1001; H. Sandhu, "Effectiveness of Standard Local Anesthetic Bupivacaine and Liposomal Bupivacaine for Postoperative Pain Control in Patients Undergoing Truncal Incisions: A Randomized Clinical Trial," *JAMA Netw. Open*, 2021; 4(3): e210753; K. Bessoff, "Chest Wall Analgesia – Where Do We Go from Here?" *JAMA Netw. Open*, 2021; 4(11): e2133839; C. Guerra-Londono, "Assessment of Intercostal Nerve Block Analgesia for Thoracic Surgery: A Systematic Review and Meta-Analysis," *JAMA Netw. Open,* 2021, 4(11): e2133394. The debate continues, and journal articles and journal authors are subject to continued scrutiny and criticism.

No single experiment and no single academic article can be the last word on this subject.

It is not only journal authors who face a competitive environment – it is also the publications themselves. Thus, at https://pubs.asahq.org/anesthesiology/pages/about-the-journal *Anesthesiology* represents that it has a Journal Impact Factor of 8.986. This means that an average *Anesthesiology* article is, within two years of publication, cited 8.986 times. *See* Clarivate, *Journal Citation Reports: Learn the Basics*, https://clarivate.libguides.com/jcr. *Anesthesiology* further asserts that its latest Journal Impact Factor is "an increase of 13.8% and the highest in the journal's history — with 5-year impact factor of 8.753 (vs 8.139 last year)."

*Anesthesiology* also represents that it carries a Journal Citation Indicator of 2.83. This metric, conceptually like the Journal Impact Factor, allows comparisons of scientific journals in different fields. *See https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8411047/.* Further, the citation half-life for *Anesthesiology* articles is 11.6 years. Citation half-life measures the longevity of articles' impact. https://www.science.org/content/article/secret-half-lives-scientific-papers#:~:text=The%20median%20half%2Dlife%20across,to%205%20years%20after%20publication.

If *Anesthesiology* publishes scientifically erroneous articles, these measures, calculated, as appropriate, to the second and third decimal places, will diminish. Authors will submit their manuscripts to other journals, with more impressive statistics and better reputations. Such diminution would impact the membership and esteem of ASA, as well as the professional standing of *Anesthesiology*'s editors.

*Daubert v. Merrell Dow Pharmaceutical, Inc.,* 509 U.S. 579, 598 (1993), summarized the process:

> "The scientific method is advanced by broad and wide-ranging consideration of a multitude of hypotheses, for those that are incorrect will eventually be shown to be so, and that in itself is an advance."

## II. The Legal System Is Ill Suited to Resolve Scientific Questions Like Those Addressed in the *Anesthesiology* Articles.

The legal system of the United States is not designed to debate technical, scientific opinions, such as those addressed in the *Anesthesiology* articles. *Anesthesiology* is run by and for experienced physicians and other scientists, while the legal system is a branch of a democratic government, run by and for the people. The emphases are different. Anesthesiologists are guided by their need to care for their patients, while the judicial system adheres to a democratic imperative: let the people – represented by a lay jury – decide.

Thus, *Daubert,* , following Federal Rule of Evidence 702, confirmed a change in the admissibility standards for expert testimony on scientific subjects. *Daubert* specifically rejected the rule of *Frye v. United States*, 54 App.D.C. 46, 293 F. 1013 (1923), which had held that expert testimony relating to scientific findings should be admissible only if the testimony is based on techniques and results "generally accepted" as reliable in the relevant scientific community. 54 App.D.C. at 47, 293 F. at 1014. The Court observed that Rule 702 was in line with the "liberal thrust" of the Federal Rules of Evidence, which were "designed to depend primarily upon lawyer-adversaries." 509 U.S. at 588-589.

As an illustration of the unsuitability of the legal system for this dispute, consider the issue of how industry-funded research should be weighed against independent research. The *Anesthesiology* authors maintain that industry-funded research should be viewed with skepticism, because of an inherent bias. *See*, *e.g.,* JA159. Pacira, on the other hand, asserts that industry-funded research, because it is better funded, is likely to be more thorough than independent research. JA151. There is no way that a court can resolve these matters of opinion – they are for informed scientists.

As another example, anesthesiologists must consider how an opioid pain reliever stacks up against a non-opioid pain reliever, which may cost one hundred times as much as the opioid. How should expense be measured against the

possibility of addiction? The answer, which will vary from patient to patient, should be determined by an experienced clinician and not by a judge or a jury.

Chief Justice Rehnquist correctly observed: "definitions of scientific method, scientific validity, and peer review [are] matters far removed from the expertise of judges." *Daubert*, 509 U.S.at 599 (Rehnquist, C.J., concurring in part and dissenting in part). *See, also,* the cases cited at p. 33 of Appellee's Brief. In short, the veracity of technical articles on anesthetics is better decided through the adversary processes of anesthesiologists and other knowledgeable scientists than through the adversary processes of lawyers.

## III. Relaxation of the Standards for Trade Libel Would Undermine Medical Research.

Liberalizing the law of trade libel would suppress medical research. An article, although scientifically sound, may be rejected under the mere fear that it could trigger an action for libel, even if that action might ultimately be dismissed.

The British Medical Journal has observed that, if an article could spark a libel action, it must consider not only the likelihood that it may ultimately prevail but also the expense it could incur in successfully defending against such a suit. A. Grayling, "End Libel Law's Chilling Effect on Science," *BMJ* 2010:340:c339. It went on to say

> "The looming shadow of libel action risks preventing … clinicians and researchers from raising questions and from criticizing and challenging. … [I]n science … the very lifeblood depends on scrutiny

of claims and results. ... [T]he minatory presence of the libel law does not merely give an easy tool to those who wish to quell criticism but forces self censorship so that the criticisms are not even made." *Id.*

Similarly, *Pediatrics*, the principal publication of the American Academy of Pediatrics, noted a situation in which it required such heavy editing, merely to avoid a potential libel action, that the authors withdrew the paper. It acknowledged that this standard, if widely adopted by journal publishers, would have "a chilling effect on science and negative implications for public health." J. Bakan, et al, "Medical Journals and Free Speech," *Pediatrics*, 2015 Mar; 135(3): 403-405.

This brief has already listed, at p. 9 *supra*, a small fraction of the many technical articles on the efficacy of liposomal bupivacaine. If the debate on this drug and the many other drugs whose use may be questioned could be suppressed, the harm to medical research and to patient care would be incalculable.

## CONCLUSION

Scientific research is inherently tentative and subject to changed conditions and deeper understandings, which may evolve over time. Subject to this limitation, the scientific community has developed mechanisms to ensure the integrity of its research. These mechanisms employ the scrutiny of numerous scientists in a competitive environment.

The judicial system is ill-suited to confirm scientific advancements. Legal oversight of the scientific process is not only unnecessary but is profoundly

detrimental. Were the judicial system to impose its heavy hand on the scientific method, medical advancements would inevitably be impeded.

Academic medical journals constantly publish studies, commentaries, and editorials about the effectiveness of drugs, providing an invaluable service to physicians and the patients they serve. These journals must be free to conclude that a particular drug is "not superior" or more costly than another, without the risk of litigation.

For these reasons and the reasons set forth in the brief of the Defendants/Appellees, *amici* urge this Court to affirm the judgment below.

Date: September 30, 2022

Respectfully submitted,

/s/ Leonard A. Nelson
Leonard A. Nelson
American Medical Association
330 N. Wabash Avenue
Chicago, Illinois 60611
(312) 464-5532
Leonard.nelson@ama-assn.org
Attorney for *Amici Curiae*

## COMBINED CERTIFICATIONS

1.     **Bar Membership:** I hereby certify that I am admitted to and a member in good standing of the Bar of the United States Court of Appeals for the Third Circuit.

2.     **Word Count:** I hereby certify that this brief complies with the type-volume requirements and limitations of Fed. R. App. P. 32(a). Specifically, this brief contains 3,073 words in 14-point Times New Roman font.

3.     **Certification of Service on Counsel:** I hereby certify that on September 30, 2022, the foregoing brief was served by the Court's electronic filing system on all counsel of record in this case.

4.     **Certification of Identical Compliance:** I hereby certify that the text of the electronic brief is identical to the text in the paper copies.

5.     **Certification of Virus Check:** I hereby certify that a virus detection program has been run on the file and that no virus was detected. The version of the virus detection program used was SentinelOne 21.6.5.1072.

September 30, 2022                    /s/ Leonard A. Nelson
                                      Leonard A. Nelson
                                      Attorney for *Amici Curiae*